**WRENN BENDER LLLP**
Aaron M. McKown, California Bar No. 208781
Paula L. Zecchini, California Bar No. 238731
2 Park Plaza, Suite 550
Irvine, California 92614
Tel.: (949) 202-5818
amckown@wrennbender.com
pzecchini@wrennbender.com

Attorneys for Defendants
GODADDY.COM, INC. and DOMAINS BY PROXY, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,

Plaintiff,

v.

GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,

Defendants.

Case No. 5:12-mc-80192-EJD
Magistrate Paul Singh Grewel

[USDC SD Case No: CV10-3738-ABC (CW)]

**GODADDY.COM, INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL DOCUMENTS AND DEPOSITION TESTIMONY FROM NON-PARTY GOOGLE, INC.**

**<u>Hearing</u>**

Date: October 2, 2012
Time: 10:00 A.M.
Place: Courtroom 5
280 South 1st Street
San Jose, CA 95113

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

## I. INTRODUCTION

In opposition to Go Daddy's motion, Google provides this Court with a litany of reasons as to why it should not be required to provide discovery deemed relevant by two litigants whose interests are diametrically opposed, as well as the presiding judge of the U.S. District Court for the Central District of California. Not one of these reasons justifies the denial of Go Daddy's motion.

First, Google attempts to avoid its discovery obligations by claiming a contractual agreement between Go Daddy and Google pursuant to which Go Daddy allegedly agreed to forego conducting discovery from Google in relation to this action. Google's argument suffers from a fundamental failure: the lack of any evidence to contradict the sworn testimony of Go Daddy's counsel, Aaron McKown, who averred that at no time did he authorize Bryan Cave attorney Eric Schroeder to broker an agreement whereby Go Daddy would forego its right to conduct discovery of Google in exchange for Google's agreement to waive any perceived or potential conflict.

More problematic for Google, however, is its admission that no such agreement was ever reached. In support of its claim that Go Daddy is "contractually barred" from seeking the discovery at issue, Google attempts to use legal jargon and contract-related catchphrases to make up for what it lacks in evidence: facts demonstrating the existence of an actual contract in which both parties gave up something of value. No such "agreement," "bargain," or "deal" was ever reached between the parties, despite Google's significant wordsmithing efforts. Indeed, Google admits **in bold** that it did not accept the offer made by Mr. Schroeder. Google's repeated reference to Go Daddy's enjoyment of "benefits" and "fruits" is insufficient to convert what was at most an unauthorized, gratuitous promise into a legally binding contract.

Google's attempt to avoid discovery based on a claimed lack of relevance also fails. The Central District previously determined that the contents of the specific advertisements on the domain names at issue are not only relevant to the determination of bad faith, but "support[] an inference of bad faith." As stated in Go Daddy's Motion, Google maintains complete control over the AdSense program that places advertisements on domain names in Go Daddy's parked page program. In light of the trial court's determination, discovery related to (1) the general operation of Google's AdSense program, (2) Google's placement of advertisements on the domain names at

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

issue, and (3) the revenues generated by both Google and Go Daddy, are not only calculated to lead to the discovery of admissible evidence, but go to the ultimate issue of whether Go Daddy is liable for cybersquatting under the ACPA.

Google's contention that the discovery sought by Go Daddy is unduly burdensome is belied by its own testimony, as well as sworn testimony and documentary evidence submitted by AMPAS. The time and cost estimates proffered by Google ignore the fact that it previously identified four individuals responsible for managing Google's parked page relationship with Go Daddy and tasked those individuals with identifying at least a portion of the universe of documents at issue. Google's gross mischaracterization of the document requests and deposition categories issued by Go Daddy are easily resolved by resort to the narrowly tailored discovery requests actually served. Google's attempt to broaden the discovery sought by Go Daddy to "*everything* . . . about one of Google's major advertising products" serves only to demonstrate Google's significant interest in the outcome of this litigation; an interest that courts repeatedly recognize tilts the burden of production in favor of the requesting party.

Google failed to identify any reason why this Court should relieve it of the discovery obligations imposed by Rule 45. Go Daddy respectfully requests the Court grant its motion to compel and issue an order enforcing compliance with Go Daddy's properly issued subpoenas.

## II. GOOGLE CANNOT AVOID ITS DISCOVERY OBLIGATIONS

### A. <u>Go Daddy is Not "Contractually Barred From Seeking Discovery from Google"</u>

Google claims that Go Daddy is "contractually barred from seeking discovery from Google." Opp. at 1:17. Yet, Google fails to present any evidence that Bryan Cave attorney Eric Schroeder had the authority to bargain away Go Daddy's right to conduct discovery of Google in relation to the underlying litigation in exchange for Google's agreement to waive any perceived or potential conflict. Nor does Google present any evidence establishing the existence of a contract between Google and Go Daddy.

Google spends much of its opposition extolling the relevance of an email in which Mr. Schroeder requested a conflict waiver in exchange for an agreement not to conduct discovery. Not

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

only does Google fail to provide any support for its bare assertion that Mr. Schroeder had Go Daddy's authority to make such an offer, the only available evidence demonstrates that no such authority existed.

As stated in Go Daddy's Motion, and sworn to in the accompanying Declaration of Aaron McKown, at no time did Go Daddy request and/or authorize Mr. Schroeder to (1) seek a conflict waiver from Google or (2) promise Google that Go Daddy would refrain from taking discovery in relation to the underlying litigation. Declaration of Aaron McKown in Support of Motion to Compel ("McKown Decl.") at ¶ 18. Rather than submit sworn testimony from Mr. Schroeder contradicting the facts contained in Mr. McKown's declaration, Google relies solely on its own musings and speculation, offering this Court a rambling series of rhetorical questions and libelous allegations of perjury, all of which lead to a single statement in support of its unsubstantiated theory: "There can be no other conclusion." Opp. at 3:3-4:1. Google's flawed deductive reasoning aside, there is simply no evidence to support its position.

This issue, however, is of no consequence because even assuming, *arguendo*, that Mr. Schroeder was authorized to make the offer contained in his email, Google readily admits that it *did not accept* Mr. Schroeder's offer: "**Under the circumstances, we're not comfortable waiving the conflict.**" Opp. at 2:9-10 (emphasis in original). No amount of editorial license can change this fact.[1] Mr. Schroeder's subsequent unauthorized and gratuitous promise not to conduct discovery of Google did not create an "agreement" or "contract" between the Google and Go Daddy.

It is hornbook law that a written contract only exists when *both parties* assume some legal obligation. *See Mattei v. Hopper*, 51 Cal. 2d 119 (1958). Where an agreement leaves one party free to perform or to withdraw from the agreement at his own unrestricted pleasure, the promise is illusory and lacks consideration—no contract is created. *See id.* This is exactly the factual scenario provided by Google. Indeed, Google admits that it did not give up anything in exchange

[1] The most egregious example of Google's attempt to convince this Court that a contractual agreement was reached is its blatantly false statement that "[Go Daddy] sought a waiver and [] obtained one." Opp. at 5:3-4.

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

for the promise not to conduct by discovery made by Mr. Schroeder. *See* Opp. at 2:9-10. While Google may claim that it refrained from objecting to Bryan Cave's representation of Go Daddy in the underlying litigation, it certainly did not agree to do so.

Nor does the record establish that Google would have had any legal or ethical basis for objecting to Bryan Cave's continued representation of Go Daddy. The parties agree that, on the facts before this Court, a conflict between Go Daddy and Google would have arisen only upon the service of a discovery subpoena on Google. *See* Opp. at 4:20-5:2. Yet, at the time Mr. Schroeder made his unauthorized offer, Go Daddy had yet to propound any such discovery. Google fails to present this Court with any facts to support a claim its Go Daddy is barred from proceeding with the requested discovery.

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

**B. <u>Google Cannot Avoid Discovery By Narrowing The Breadth of Issues Established By The Trial Court and Misstating the Nature of the Discovery Sought By Go Daddy</u>**

Google makes a significant effort to convince this Court that discovery should be denied on the basis of its own self-serving determination that the "discovery sought is wholly irrelevant." Opp. at 6:19. Google's argument confuses the issues before the trial court and repeatedly mischaracterizes the nature of the discovery sought by Go Daddy. Regardless, it is unavailing.

Google makes much of Go Daddy's alleged failure to "point [to an] ACPA case in which the content of the accused websites was a factor in determining infringement." Opp. at 7:8-9. Google misses the point. Under the ACPA, bad faith is determined by resort to nine non-exhaustive factors. *See* 15 U.S.C. § 1125(d)(1)(A) and (B). Although Google correctly notes that none of the nine factors enumerated in the ACPA addresses the content of the advertisements placed on allegedly infringing domain names, Google's argument ignores the non-exhaustive nature of those factors. *See* 15 U.S.C. § 1125(d)(1)(B)(i). The trial court in the matter between Go Daddy and AMPAS does not.

Although Google claims it is Go Daddy and AMPAS who seek to enlarge the scope of the claims in the Second Amended Complaint in an attempt to "bring Google into the mix," the discovery sought by Go Daddy was dictated by the trial court's ruling on Go Daddy's prior

Motion to Dismiss. Opp. at 7:20-21. On September 20, 2010, the trial court denied Go Daddy's Motion to Dismiss AMPAS' ACPA claim, finding that notwithstanding the nine bad faith factors enumerated in the ACPA, "the presence of two circumstances supports an inference of bad faith intent to profit from the Academy's marks." Decl. of A. McKown in Support of Reply to Motion to Compel, ¶ 5, Exh. A at 15:1-10. The second of these circumstances, although not an enumerated factor establishing bad faith under the ACPA, was the fact that "examples of parked pages attached to the complaint contain advertising links that would likely appeal to visitors looking for the Academy's marks." *Id.*

It is undisputed that the advertising links referenced by the trial court were chosen and provided by Google and that the trial court's decision determined that the content of those advertisements was relevant to the issue of bad faith. As such, the discovery sought by Go Daddy relating to the general nature of Google's AdSense program and its specific operation in choosing and placing advertisements on the domain names directly bears on the issue of bad faith and, thus, is discoverable. *See* Fed. R. Civ. P. 26(b) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .").

In pushing its claim of irrelevance, Google highlights Go Daddy Request Nos. 3, 4, 6, and 12, arguing that each of the requests is "untethered to any legitimate issue in a cybersquatting case." Opp at 8:1-2. Again, Google misses the point. This is not simply "a cybersquatting case," this is a cybersquatting case in which the trial court (1) identified an additional bad faith factor that is directly related to Google's AdSense program and (2) decided that not only is this factor relevant to the issue of bad faith, it *creates an inference* of bad faith.

There can be no argument that the requests cited by Google are outside the scope of relevance established by the trial court's statements, no matter how much Google seeks to mischaracterize the information sought by the requests. By way of example, Go Daddy Request No. 12, contrary to Google's contention, does not require Google to produce any algorithms. Rather, it seeks production only of those documents sufficient to describe Google's method for determining which pay-per-click ads to place on Go Daddy's parked pages. The production of Google's algorithms would not even be responsive to this request. Rather, the request seeks

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

internal documents sufficient to explain how advertisements are selected—documents that may be as basic as a memorandum or email and which Google admitted it could produce as part of its meet and confer discussions with AMPAS. *See* Declaration of Enoch Liang ("Liang Decl.") ¶ 7, Exh. D.

Likewise, Go Daddy Request No. 6, which seeks Google's policies with regard to the handling of trademark complaints, particularly as they relate to its AdSense program, goes directly to the heart of the case. For example, if a trademark holder complains that a pay-per-click advertisement is infringing its trademark, how does Google respond? Will it stop serving that advertisement to parked pages? Does it notify Go Daddy or any other parked page provider of the claimed infringement? Does it terminate its relationship with the parked page provider? Notably, none of these actions occurred in relation to the domain names at issue in the Second Amended Complaint. If any of these actions, or any similar actions, are within Google's standard operating procedure for responding to trademark complaints, then those facts are directly relevant to a finding of a lack of bad faith on the part of Go Daddy.

Google provides no reason why this Court should not defer to the trial court with regard to the scope of the claims at issue between Go Daddy and AMPAS, and the breadth of related discovery. The trial court has determined the content of the advertisements placed on each of the domain names at issue to be relevant to the issue of whether Go Daddy's alleged actions were undertaken in bad faith. The undisputed facts demonstrate that Google, *in its sole discretion*, was responsible for choosing and placing the advertisements on the domain names at issue. As such, the discovery sought by Go Daddy is not only reasonably calculated to lead to the discovery of admissible evidence, but it is essential to Go Daddy's defense of the claims asserted by AMPAS.

### C. <u>The Burden on Google is Minimal Relative to the Burden on the Parties to the Underlying Litigation and Google's Own Interest in the Outcome</u>

In an effort to inflate the time and monetary burden of complying with Go Daddy's subpoenas, Google disingenuously broadens the scope of the discovery sought by Go Daddy, mischaracterizing even the most narrowly tailored requests as seeking "*everything*, for seven years, about one of Google's major advertising products." Opp. at 12:22-23 (emphasis in

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

original). However, a simple review of the discovery requests served by Go Daddy demonstrates that each is narrowly tailored to a discrete subject area. To the extent Google claims that it will need to spend countless hours and dollars identifying individuals to assist with knowledge sufficient to locate and/or testify on the topics at issue, this work has previously been completed. *See* Liang Decl. at ¶ 7, Exh. D. Go Daddy is not asking Google to recreate the wheel; the fact that it seems intent on doing is not a basis on which to deny Go Daddy the discovery sought.

Interestingly, one of the strongest arguments in favor of production was demonstrated by Google's own admission that the AdSense program is one of its "major advertising products." Opp. at 12:23. Although Google has repeatedly tried to distance itself from the underlying litigation, the import of AMPAS' claims, which seek to hold Go Daddy liable for *inter alia* contributory cybersquatting as a result of providing a method for the placement of specific advertisements on allegedly infringing domain names, cannot be underestimated in relation to Google's bottom line. An adverse ruling for Go Daddy will not only have a significant impact on the revenues generated by Google from Go Daddy's parked page program, but it will likely have industry-wide repercussions on the use of Google's AdSense program by parked page providers.

Given Google's undeniable monetary interest in the underlying litigation, it has no cause to complain about being subject to discovery. *See*, *e.g.*, *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C. 1992) (noting that "it is relevant to inquire whether the putative non-party actually has an interest in the outcome of the case."). Documents produced to date demonstrate that Google makes millions of dollars every year from providing advertisements to be displayed on the domain names in Go Daddy's parked page program. Google actively participates in the Free and Cash Parking Programs at issue in this lawsuit. Google is not only a relevant witness with relevant information relating to the specific issues in this case, but Google stands to lose a significant amount of revenue from not only Go Daddy, but also any other parked page provider for whom it provides advertising content.

Nor should the Court give any weight to Google's claims that it should not be required to shoulder the burden of producing information sought by Go Daddy that is maintains is either in the possession of the parties or publicly available. *See* Opp. at 10:3-7. This is especially true

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

where, as here, Google supports it argument with oversimplified or blatantly false characterizations of a number of the requests for information propounded by Go Daddy. For example, Google claims that "evidence of Google's decision to stop supporting hosted domains" is available online. Opp. at 10:7-9. Go Daddy is well aware of the decision and is in possession of the publicly available statement conveying that decision. The information sought by Go Daddy's demand, however, is the reason *behind* Google's decision to stop supporting hosted domains, not simply "evidence of [the] decision" offered by a simple statement that "Hosted domains have gone away." Moreover, the breadth of policies and procedures sought by Go Daddy is not limited those available on its website, as applicable, but includes internal policies, standard operating procedures, informal guidelines, and other internal processes related to each targeted request.

As to Google's position that Go Daddy should be required to seek discovery of non-party documents first from AMPAS, there is absolutely no rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, nor is there an absolute rule providing that a party mush first seek those documents from an opposing party before seeking them from a non-party. *See Viacom Int'l Inc. v. Youtube, Inc.*, No. C 08-80129 SI, 2008 U.S. Dist. LEXIS 79777, at *10 (N.D. Cal. Aug. 18, 2008)( "[T]here is no general rule that [parties] cannot seek nonparty discovery of documents likely to be in defendants' possession."). Furthermore, the Advisory Committee Note to Rule 45 explains that "[t]he non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34." Fed. R. Civ. P. 45 (advisory committee's note). Thus, although it is appropriate to consider Google's status as a non-party, the fact that some documents may be in the possession of the parties or publicly available does not weigh in favor of shielding discovery.

In a further effort to validate its perceived burden, Google argues that Go Daddy seeks the reproduction of identical documents Google previously produced to AMPAS. It is not. Google claims, without citation, that many of AMPAS' requests were "virtually identical to Go Daddy's current requests" and then insinuates that it already produced the full breadth of documents

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

requested, again without citation. Opp. at 9:4-7. Specifically, AMPAS claims that it has produced "full records of Go Daddy's revenues from Google, all contracts with Go Daddy, communications with Go Daddy, and copies of all allegedly relevant Google policies" in response to AMPAS' subpoena. The production of these documents, which can hardly be described as full records given the limitations on production noted in AMPAS' own motion to compel and Google's own admissions, hardly satisfies Google's discovery obligation to AMPAS, let alone to Go Daddy. *Compare* Liang Decl. at ¶ 7, Exh. D with McKown Decl. at ¶ 10, Exh. I. Nor is Go Daddy obligated to be content with the third party discovery efforts of its opponent, which has different discovery objectives, different evidentiary obligations, and different trial strategies and theories.

**D. Current Deadlines in The Underlying Case Do Not Provide A Basis For Denying The Requested Discovery**

As yet another means to avoid providing the requested discovery, Google argues that, if compelled, it will be forced to produce documents in an expedited manner due to the current litigation schedule in the underlying case. In proffering this argument, Google ignores its own role in the delay—namely, its outright refusal to produce any documents in response to Go Daddy's subpoena, which was served on June 27, 2012. *See* McKown Decl. at ¶ 10, Exh. I. Google's original deadline to produce documents was July 27, 2012, approximately two months prior to the current fact discovery completion date.

Instead, Google seems to imply that all third party discovery need be conducted during the early stages of litigation and that when faced with a fast-approaching discovery completion deadline, courts should refuse to enforce properly issued discovery subpoenas. Not surprisingly, no legal citation is offered to support this position. Nor would such a rule be practicable. If the Court was to allow Google to avoid its discovery obligation based on this proposition, it would encourage third-parties to simply bide their time in responding to subpoenas, extending the meet and confer effort until just before the discovery cut-off, only to leave the parties empty-handed and without any recourse. Such a practice would also run afoul of the Federal Rules, which allows for discovery to be conducted up to and even beyond the court-ordered discovery completion deadline.

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

Ultimately, Google is not a party to the litigation between AMPAS and Go Daddy and need not be concerned with the current discovery timeline; this is especially true given that the fact discovery cut-off at the time of the filing of this Motion will have passed by the date of the hearing. Any order compelling discovery issued by this Court will undoubtedly be accompanied by an appropriate timetable in which Google can produce documents and prepare its Rule 30(b)(6) witness(es) for deposition. AMPAS and Go Daddy will ensure that any such timetable is accommodated either by resort to the trial court for a further continuance or by an informal agreement between the parties to continue fact discovery beyond the current discovery deadline.

**E. Go Daddy Satisfied Its Meet and Confer Obligations**

As a last ditch effort to avoid its discovery obligations, Google remarkably claims that Go Daddy failed to meet and confer in advance of filing its motion. Yet, Google does not deny that the parties engaged in a telephonic meet and confer to discuss the subpoenas. Nor does Google claim that it ever offered a witness for deposition. Indeed, Google has consistently refused to produce a witness in response to the subpoenas issued by both Go Daddy and AMPAS. Instead, Google argues that its subsequent vague offer to discuss the possibility of a document production, after refusing to produce a single document in response to a single category of requests, should nonetheless bar Go Daddy's motion. Such a self-serving statement does not warrant such extraordinary relief. The undisputed record is clear that the parties met and conferred regarding the production of documents and a Rule 30(b)(6) witness, both of which Google refused to provide. To claim otherwise is, in Google's own words, "hogwash."

## III. CONCLUSION

For the reasons set forth above, Go Daddy's motion for an order compelling Google to produce documents, as well as a Rule 30(b)(6) corporate witness, should be granted in all respects.

Dated: September 12, 2012

**WRENN BENDER LLLP**

By: */s/ Paula L. Zecchini*

Paula L. Zecchini

Attorneys for Defendants GODADDY.COM, INC. and DOMAINS BY PROXY, INC.

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

Case5:12-mc-80192-EJD Document13 Filed09/12/12 Page12 of 12

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

11
GODADDY.COM, INC.'S REPLY IN SUPPLY OF MOTION TO COMPEL GOOGLE, INC.'S COMPLIANCE WITH DOCUMENT AND DEPOSITION SUBPOENA